UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
(at Bowling Green)

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>                    PLAINTIFF<br><br>vs.<br><br>DALLAS NORRIS,<br>                    DEFENDANT | )<br>)<br>)        CASE NUMBER<br>)        1:11-CR-0034-R<br>)<br>)<br>)<br>) |

_____

MEMORANDUM IN SUPPORT OF DEFENDANT'S
MOTION TO SUPPRESS EVIDENCE SEIZED
PURSUANT TO SEARCH WARRANT

Defendant Dallas Norris, by Counsel, has moved the Court to suppress the evidence seized pursuant to search warrant obtained by the Kentucky State Police. For the reasons herein, Defendant's Motion should be sustained. See, e.g., Brown v. Illinois, 422 U.S. 590 (1975).

FACTS

On November 12, 2011, at approximately 12:46 p.m. CT, the Kentucky State Police received an anonymous tip that marijuana was being grown indoors at 13930 Thompkinsville Road in Barren County. Troopers Daniel White and Jeremy Hodges (excitedly, no doubt) jumped into their cars and drove to the Thompkinsville Road property, turned through a gate in the fence at the front of the property, passed by the building housing a worm farm, and drove approximately 1,500 feet, <u>more than a quarter mile</u>, into the curtilage area of the farm belonging to Josephine Polan and occupied by Dallas Norris and his employees, where they found three mobile homes set up and occupied, each with its own outbuildings and private area on the property. (See Exhibit 1a, attached hereto.)



Figure 2. Officers drove past a gate and more than ¼ mile to the Norris home and adjoining area. The area around the curtilage is dense woods. See Photos, Exhibits "C", "D" and "E".

Anxious to make a seizure, Trooper White proceeded to the home of the Defendant, Dallas Norris (shared part-time by his fiancé Josephine Polan, pending sale of her Florida home), while Trooper Hodge stopped at the mobile home about 200 feet south of the Norris place, the home of Roger and Shelly Goheen. Mrs. Goheen informed the trooper that Dallas Norris was not at home.

Trooper White went to the door of Mr. Norris' mobile home and knocked but no one answered. The troopers re-joined and then both troopers drove to the area of the curtilage they believed contained a marijuana growing operation and got out of their cars to search around the buildings adjacent to Dallas Norris' home. They walked to the building they believed housed marijuana, past two parked pickup trucks, and tried the door and, apparently, smelled marijuana. The troopers then went to the left, north, under a shed roof attached to the west end of the building, shielded from public view by a wall at the west side of the shed roof. They came out at the rear of the building, at the west end of it, and walking among the tools and equipment stored under the shed roof off the rear of the building, they proceed along the back of the building to the

east end of it. While approaching the east end of the building, they spotted two men standing out to the east of the east end of the building. They cut through yet another area under the shed roof and came out through the shed roof area on the east side of the building. The two troopers then approached the two men, Roger Goheen and John Landrum, who were walking around the deer feeding area about 50 feet to the east of the easternmost building, discussing a proposed hunt. There was as yet no warrant issued or applied for and no exigent circumstance whatsoever to justify so great a trespass into the private areas around the Norris home and garage.



Figure 3.   Officers walked past Norris's home to the suspect building, around to the rear of the building, under the shed on the rear of the building, then over to detain Goheen and Landrum.

Once the Troopers contacted Goheen and Landrum, they order the two men to step out to the front of the building, just southwest of the building to the location where the troopers had parked, presumably behind the two parked pickup trucks. (See Exhibits 1B, 2a, 2b, 2c and 2d.)

3

The troopers interviewed the two men about the property and the owner, who the men reported, as Mrs. Goheen had previously done, was away on an errand. One trooper instructed Mr. Goheen to call Dallas Norris on his cell phone.

Now <u>approximately 15 minutes after the illegal search</u>, Trooper White took the phone and walked away from any possible witnesses so as to have a private conversation with Norris during which, White would later claim, Norris told him it was "okay" for the Troopers to "look around the property." This Norris adamantly denies. Norris drove immediately to the property and refused to permit any searching of the property. He was detained along with Goheen and Landrum, while one trooper took the results of the illegal search to the state judge to obtain a warrant for further searching.

Having searched all the way around the suspect building without a warrant, Trooper White asserts that he "smelled marijuana" about 15 feet from the easternmost outbuilding. The wind that day was blowing strongly out of the southwest. According to ATF agent Cruces, who joined the troopers at the scene soon thereafter, it was so windy that it was hazardous for law enforcement personnel as they later attempted to burn the marijuana. Weather reports for the area universally showed the prevailing wind that day was out of the southwest at 10-15 miles per hour. The marijuana was more likely found in the rear and east of the building. The troopers simply ignored the privacy and rights of Dallas Norris and the 4th Amendment to the U.S. Constitution.

## ARGUMENT

> "The poorest man may in his cottage bid defiance to all the forces of the crown. It may be frail; its roof may shake; the wind may blow through it; the storm may enter; the rain may enter; but the King of England cannot enter - all his force dares not cross the threshold of the ruined tenement!" William Pitt, Speech on the Excise Bill (1763) (quoted in Miller v. United States, 357 U.S. 301, 307 (1958)).

It is fundamental in American law that a man's home is his castle. (See, e.g., "'A Man's Home Is His Castle?': Reflections On The Home, The Family, And Privacy During The Late Nineteenth And Early Twentieth Centuries", Jonathan L. Hafetz, 8 Wm. & Mary J. Women & L. 175 (2002) (copy attached). This idea forms the basis for the provisions of the Fourth Amendment to the United States Constitution:

> "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. CONST., Amend. IV.

### The 6th Circuit and Curtilage

Unquestionably, the Fourth Amendment extends protection to the "curtilage" of one's house. *United States v. Jenkins*, 124 F.3d 768, 772 (6th Cir. 1997). In *Jenkins*, the Court looked to *United States v. Dunn*, 480 U.S. 294, 301 (1987), for guidance in defining what constitutes curtilage. The Court suggested the following considerations should factor into the analysis:

> Drawing upon the Court's own cases and the cumulative experience of the lower courts that have grappled with the task of defining the extent of a home's curtilage, we believe that curtilage questions should be resolved with particular reference to four factors: the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by. We do not suggest that combining these factors produces a finely tuned formula that, when mechanically applied, yields a "correct" answer to all extent-of-curtilage questions. Rather, these factors are useful analytical tools only to the degree that, in any given case,

5

> they bear upon the centrally relevant consideration – whether the area in question is so intimately tied to the home itself that it should be placed under the home's "umbrella"of Fourth Amendment protection. *Dunn*, 480 U.S. at 301 (citations and footnote omitted).

### Defendant's Claims

Mr. Norris asserts that his rights have been violated in a manner from which the Court ought to protect all Americans. In this matter, Norris asserts (1) that the evidence given in the affidavit for the search warrant is "fruit of the poisonous tree" in that the Kentucky State Police conducted an illegal search and then used the fruit of that illegal search, marijuana smell, in the affidavit to provide the basis for the finding of probable cause to issue the search warrant; (2) that, with the illegally obtained evidence excised, the uncorroborated "anonymous tip" alleged herein lacked sufficient specificity and reliability to provide a basis for the search warrant; (3) that the trooper falsely asserted that he smelled marijuana "15 feet to the southwest" of the building where marijuana was found when the wind was out of the southwest at 10 to 15 miles per hour and that the officers illegally seized items that could not possibly have fit the items described in the search warrant; and (4) that the troopers illegally seized numerous items from the property far beyond the scope of the search warrant, items that did not fit the description of items to be seized and that had no connection whatsoever to the alleged illegal activities.

### 1. The Initial Search

> "The approval given today to what was done by arresting officers in this case indicates that we are in danger of forgetting that the Bill of Rights reflects experience with police excesses. It is not only under Nazi rule that police excesses are inimical to freedom. It is easy to make light of insistence on scrupulous regard for the safeguards of civil liberties when invoked on behalf of the unworthy. It is easy. History bears testimony that by such disregard are the rights of liberty extinguished, heedlessly at first, then stealthily, and brazenly in the end." *Davis v. United States*, 328 U.S. 582 (1946), Frankfurter dissenting.

Unlike the innocuous and familiar roaming of the entire neighborhood by Billy and the other children in the Family Circus (Figure 1.), the roaming of the neighborhood and into the private areas of the homes by police represents the most threatening and frightening invasion of government into the lives of citizens.



Figure 1.  Police do not innocently or aimlessly roam around the property of suspects.

The police do not innocently, accidentally or aimlessly wander around the homes of suspects.  Instead they invade the property with the motive of obtaining incriminating evidence accompanied by the full force and power of government.  In this case, the Kentucky State Police took an illegal and circuitous route (See Figures 2 and 3, and satellite photos, Exhibits 1a and 1b) to explore the property of Dallas Norris, looking for a marijuana grow operation.  They did so with no warrant and with no exigent circumstance to justify the invasion.

7

It is not appropriate for the troopers to conduct an illegal search to obtain evidence to be used to obtain a search warrant and even if they have probable cause, that probable cause must be accompanied by exigent circumstances or some other exception to the warrant requirement in order to make the search constitutional  *Kirk v. Louisiana*, 122 S.Ct. 2458, 2459 (2002); *United States v. Lewis*, 231 F.3d 238, 241 (6th Cir. 2000).

### The Curtilage Factors

In *United States v. Jenkins*, 124 F.3d 768, 772 (6th Cir. 1997), the Court looked to *United States v. Dunn*, 480 U.S. 294, 301 (1987), for guidance in defining what constitutes curtilage. The Court suggested the following four factors:  (1) the proximity of the area to the home, (2) whether the are is included within an enclosure surrounding the home, (3) the nature of the uses to which the area is put, (4) the steps taken by the resident to protect the area from observations of people passing by.

Mr. Norris had a gate and fencing around his property. His home and the nearby buildings are more than 1,500 feet from the road. The back side around the house and buildings was cleared approximately 50 feet back, surrounded on three sides by woods which set off the property from the surrounding fields and sheltered the area of the home and outbuildings from public view. The "suspect building" is at least 75 feet beyond the front door of the mobile home. This area is clearly not "open fields", and the area is clearly not open to the public. In this area were kept tools, wholesale confiscated by police, gardening and farming equipment and a park-like cleared area surrounding the buildings. The very layout of the property along with the maintenance of a clear tree line separated from the relatively small cleared area <u>and a fence</u>, demonstrates the lengths to which Dallas Norris went and the steps taken by him to protect the area from observations of people passing by.

Clearly the backyard and living area around the home and garage of Dallas Norris are protected. This area was neatly mowed, isolated from others, set in a park-like setting around his living area and distinct from the adjacent woods. Cf. *United States v. Jenkins*, 124 F.3d 768 (6th Circuit 1997). "It is important to remember that defendants live in a remote and sparsely populated area where they would have had no particular reason to believe that they needed to construct a high impenetrable fence around the backyard to ensure their privacy." *Jenkins* at 770.

"Federal courts … have held that barns, like other rural outbuildings, lie within the curtilage of the farmhouse. See *United States v. Berrong*, 712 F.2d 1370, 1374 (CA11 1983) ("[t]he 'outer limits of the curtilage' have been expressly defined to be `the outer walls of the extreme outbuildings'") (quoting *United States v. Williams*, 581 F.2d 451, 454 (CA5 1978)); *Rosencranz v. United States*, 356 F.2d 310, 313 (CA1 1966) (barn located an unknown distance from house and separated from it by a driveway deemed within curtilage); *Walker v. United States*, 225 F.2d 447, 449 (CA5 1955) (barn located 70 to 80 yards from house, separated from house by private driveway, and surrounded by separate fence is within curtilage); *United States v. Swann*, 377 F. Supp. 1305, 1306 (Md. 1974) (barns and outbuildings on farm were part of curtilage); *United States v. King*, 305 F. Supp. 630, 634 (ND Miss. 1969) (barns and other outbuildings of unknown distance from house within curtilage)." *United States v. Dunn, Justice Brennan dissenting*.

Warrantless searches are presumptively unreasonable. *United States v. Carter*, 315 F.3rd. 651 (6th Circuit, 2003); citing *Payton v. New York*, 445 U.S. 573, 585-6 (1980). The Fourth Amendment prohibits police activity which, if left unrestricted, would jeopardize individuals' sense of security or would too heavily burden those who wished to guard their privacy. *Dunn, Justice Brennan, dissenting*. Supression is proper where the officers smelled marijuana only

after entering the curtilage. *United States v. Vega*, 221 F.3rd. 789 (5th. Circuit, 2000); cited in *United States v. Carter*, 315 F.3rd. 651 (6th Circuit, 2003).

Just recently in the case of *United States v. Galaviz*, (found on the Sixth Circuit website at the URL http://*www.ca6.uscourts.gov/opinions.pdf/11a0115p-06.pdf* ), the Court said that the question in a suppression case is,

> "…whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint. *Hudson v. Michigan*, 547 U.S. 586, 592 (2006) (quoting *Wong Sun*, 371 U.S. at 487-88) (internal quotation marks omitted).

Unlike the gun found in plain view in the *Galaviz* case, the "marijuana smell" in this case (and indeed the detailed description of the property in the affidavit) was observed only as a direct result of the invasion into private areas of the Norris' home and garage. It is proper and necessary to suppress the evidence in this case as because the warrant was obtained using fruit of the poisonous tree.

Just for the record, this search was illegal under Kentucky law. See, e.g., Quintana v. Commonwealth, 276 S.W.3d 753 (Ky. 2008). (In *Quintana*, officers walked 40 feet across the back of the house where they claimed to smell marijuana, using that assertion in their affidavit.)

### 2. Without the Smells, the Anonymous Tip Fails.

If the reference to the smelling marijuana is removed from the affidavit, then there is no sufficient basis for a finding of probable cause. The reliability of the informant in this case is not established sufficient to satisfy the requirements under *Illinois v. Gates*, 462 U.S. 213 (1983).

Even the very detailed description in the affidavit is the product of illegally wandering around the property, taking the opportunity to step off distances around the buildings. This is a

truly invasive and illegal preliminary search of the property. See, e.g., *United States v. Lawson*, No. 05-5598 (6th Crcuit 06/05/2006).

"Though evidence obtained in violation of the Fourth Amendment is generally excluded, the Supreme Court has held that the exclusionary rule 'should be modified so as not to bar the admission of evidence seized in reasonable, good-faith reliance on a search warrant that is subsequently held to be defective.'" *United States v. Frazier*, 423 F.3d 526, 533 (6th Cir. 2006) (quoting *United States v. Leon*, 468 U.S. 897, 905 (1984)). The district court found that probable cause was so lacking that neither was the search warrant valid nor was the officers' belief in its validity reasonable. Therefore, the district court found that the search violated the Fourth Amendment and suppressed the evidence seized." *United States v. McPhearson*, 469 F.3d 518, 2006 Fed.App. 0435P (6th Cir. 11/27/2006). Without the fruit of the poison search, the affidavit in this case lacked the requisite probable cause.

### 3. The Smell was In or Behind the Shed, Not in Front.

The assertion of having smelled it 15 feet to the southwest of the outbuilding is obviously false. The wind that day made such an occurrence impossible. Gusting from 10 to 15 miles an hour, such a wind swept the smell to the east of the building, not to the west. The trooper could not have "smelled marijuana" 15 feet to the southwest of the building where marijuana was found when the wind was out of the southwest at 10 to 15 miles per hour.

By no means can the smell detected by the Trooper be considered in plain view without the trooper having violated the curtilage of Dallas Norris' home. Based on the affidavit for the search warrant, the defendants would ask for a *Franks v. Delaware*, 438 U.S. 154 (1978), hearing in addition to the hearing on suppression of the fruits of the invalid search warrant.

11

### 4. Continued Searching After Finding Probable Cause

Had the trooper really smelled marijuana on the front side of the building, there was no need to continue the search by wandering around to the rear of the buildings, which was obviously a private area of the property. Once an officer has probable cause to believe contraband is present, he must obtain a search warrant before he can proceed to search the premises…" *United States v. Chaar*, 137 F.3d 359, at 363 n.6 (6th Circuit 1998).

Even if the Troopers smelled marijuana 15 feet from the building, and <u>more than 100 feet beyond the front door of Defendant's home</u>, nothing at all prevented then from ceasing their invasion into the curtilage and sending another trooper to get the search warrant before continuing. *United States v. Carter*, 315 F.3d 651 (6 th Cir. 2003). See also *Illinois v. McArthur*, 531 U.S. 326, 331, 148 L. Ed. 2d 838, 121 S. Ct. 946 (2001) (holding that police impoundment of residence that restrained defendant from entering until warrant could be obtained was proper); *Segura v. United States*, 468 U.S. 796, 810, 82 L. Ed. 2d 599, 104 S. Ct. 3380 (1984) (opinion of Burger, C.J.) (holding that police impoundment of premises until warrant arrived after arresting occupants was not unreasonable); <u>United States v. Crespo de Llano</u>, 838 F.2d 1006, 1016 (9th Cir. 1987) (same).

### 5. Seizures beyond Scope of Warrant.

Among the items seized in this case were numerous unrelated firearms and numerous other items <u>not mentioned in the search warrant</u> and unrelated to the crime **including a <u>backhoe and pressure washers</u>** (!) and <u>collectable coins and jewelry</u>! The Fourth Amendment to the United States Constitution directs that a search warrant must describe with particularity the place to be searched and the persons or items to be seized. This constitutional protection prevents the issuance of general warrants, which "create a danger of unlimited discretion in the executing

12

officer's determination of what is subject to seizure." United States v. Savoca, 761 F.2d 292, 298-99 (6th Cir.1985), cited in United States v. Lawson, No. 05-5598 (6th Circuit 2006).

Officer who seize items under a deficient warrant or in excess of what the warrant describes may be subject to civil liability and not given immunity. *Stella Wheeler v. the City of Lansing; Dennis Wirth*, Nos. 10-1128/1160 (6th Cir. 11/08/2011).

Likewise, "where the officers unlawfully seize certain items . . . the court must suppress the unlawfully seized items…" *Waller v. Georgia*, 467 U.S. 39, 43 n.3 (1984); cited in *United States v. Garcia*, 496 F.3d 495 (6th Cir. 08/08/2007)

In this case, numerous items were seized, just because they could be sold for profit and not at all because they were listed in the warrant or related to the crime. This is just excessive, abusive and unjust and brings the entire law enforcement community into disrepute. All the evidence should be suppressed.

## CONCLUSION

For the reasons set out herein, the Court should grant Defendant's Motion to Suppress the evidence seized by the Kentucky State Police as the only just remedy in this case for the violations of the rights of Defendant and of the law.

        Respectfully Submitted,

        /s Vincent F. Heuser, Jr.
        _____

        Vincent F. Heuser, Jr.
        Attorney at Law
        3600 Goldsmith Lane
        Louisville, KY  40220
        (502)  458-5879
        *Counsel for Dallas Norris*

TABLE OF CITATIONS

Cases:
*Brown v. Illinois*, 422 U.S. 590 (1975)
*United States v. Jenkins*, 124 F.3d 768, 772 (6th Cir. 1997)
*United States v. Dunn*, 480 U.S. 294, 301 (1987),
*Kirk v. Louisiana*, 122 S.Ct. 2458, 2459 (2002)
*United States v. Lewis*, 231 F.3d 238, 241 (6th Cir. 2000)
*United States v. Berrong*, 712 F.2d 1370, 1374 (CA11 1983)
*United States v. Williams*, 581 F.2d 451, 454 (CA5 1978)
*Rosencranz v. United States*, 356 F.2d 310, 313 (CA1 1966)
*Walker v. United States*, 225 F.2d 447, 449 (CA5 1955)
*United States v. Swann*, 377 F. Supp. 1305, 1306 (Md. 1974)
*United States v. King*, 305 F. Supp. 630, 634 (ND Miss. 1969)
*United States v. Carter*, 315 F.3rd. 651 (6th Circuit, 2003)
*Payton v. New York*, 445 U.S. 573, 585-6 (1980)
*United States v. Vega*, 221 F.3rd. 789 (5th Circuit, 2000)
*United States v. Carter*, 315 F.3rd. 651 (6th Circuit, 2003)
*Davis v. United States*, 328 U.S. 582 (1946)
*United States v. Galaviz*, (http://*www.ca6.uscourts.gov/opinions.pdf/11a0115p-06.pdf* )
*Hudson v. Michigan*, 547 U.S. 586 (2006)
*Wong Sun*, 371 U.S. 471 (1963)
*Quintana v. Commonwealth*, 276 S.W.3d 753 (Ky. 2008)
*Illinois v. Gates*, 462 U.S. 213 (1983).
*United States v. Lawson*, No. 05-5598 (6th Crcuit 06/05/2006).
*United States v. Frazier*, 423 F.3d 526, 533 (6th Cir. 2006)
*United States v. Leon*, 468 U.S. 897, 905 (1984)
*United States v. McPhearson*, 469 F.3d 518 (6th Cir 2006)
*Franks v. Delaware*, 438 U.S. 154 (1978)
*United States v. Chaar*, 137 F.3d 359 (6th Circuit 1998)
*United States v. Carter*, 315 F.3d 651 (6th Cir 2003)
*Illinois v. McArthur*, 531 U.S. 326, 331, 148 L. Ed. 2d 838, 121 S. Ct. 946 (2001)
*Segura v. United States*, 468 U.S. 796, 810, 82 L. Ed. 2d 599, 104 S. Ct. 3380 (1984)
*United States v. Crespo de Llano*, 838 F.2d 1006, 1016 (9th Cir. 1987)
United States v. Savoca, 761 F.2d 292, 298-99 (6th Cir.1985)
*Stella Wheeler v. City of Lansing; Dennis Wirth*, Nos. 10-1128/1160 (6th Cir. 11/08/2011).
*Waller v. Georgia*, 467 U.S. 39 (1984)
*United States v. Garcia*, 496 F.3d 495 (6th Cir. 08/08/2007)

ARTICLES:
"'A Man's Home Is His Castle?': Reflections On The Home, The Family, And Privacy During The Late Nineteenth And Early Twentieth Centuries", Jonathan L. Hafetz,  8 Wm. & Mary J. Women & L. 175 (2002).

# EXHIBITS

1. Satellite photos of Thompkinsville Road property

    a. Satellite Photo Distant View.   It is to be noted that the curtilage is located far from the road and surrounded on three sides by un-cleared, densely treed woods, including a steep drop-off in the back.

    b. Satellite Photo of Curtilage, close view.   The relatively small and isolated area around Defendant's home, shed, garage includes a mowed yard, cleared park-like setting, separated from the woods by a fence and steep drop-off.  There can be no doubt Defendant expected privacy in this area.

2. Ground Photos of curtilage area searched:

    a. Photo of suspect garage, west end.   Police officers approached from the west, after knocking on the door of Defendant's home passed it up to wander around the suspected growing buildings.

    b. Photo of searched area, east/rear.   Troopers walked through a lean-to shed on the west end of the building, inside the private area under the lean-to shed, to get to the rear of the building.

    c. Photo of searched area, across rear of building.  Troopers walked around to the back of the building, across the back of the building to the east end of the building.  Clearly with within the curtilage, this area was a storage place for tools and equipment that Defendant secluded from public view and access.

    d. Photo of searched area at farthest end of curtilage.  Arriving at the east end, rear of the building they saw two men standing over a deer feeder, in the cleared and isolated private area of the property, planning a deer hunt.  The troopers order the stunned men to walk to the front of the building completing the troopers circle around the curtilage.