UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT BOWLING GREEN

UNITED STATES OF AMERICA                                        PLAINTIFF

v.                                        CRIMINAL ACTION NO. 1:11-CR-34-R

DALLAS NORRIS                                                  DEFENDANT

RESPONSE TO MOTION TO SUPPRESS EVIDENCE
-Electronically Filed-

Dallas Norris moves to suppress all evidence seized by law enforcement officers under a search warrant for Norris's property dated November 12, 2011.  Norris claims several grounds for suppression: that Kentucky State Police Troopers had conducted an illegal search into the curtilage of Norris's home; that the warrant that the Troopers obtained subsequent to that alleged illegal search was not supported by probable cause without the fruits of that alleged search; that the Troopers lied about smelling marijuana on the spot they said they had; that Troopers White and Hodges had an affirmative duty to leave the property and obtain a warrant after they smelled marijuana; and that, in executing the warrant, police seized items that were outside the scope of the warrant.  Those claims are unsubstantiated by case law or by the record.  The Troopers, upon their initial visit to Norris's home, did not illegally encroach on the curtilage.  Even if they had entered constitutionally protected curtilage, any encroachment was supported by law enforcement's right to "knock

and talk."  The search warrant was thus well-supported by probable cause.  Norris is correct that, without the smell of marijuana, there might be no probable cause sufficient to sustain a search warrant.  That argument, though, is irrelevant--the Troopers did legally smell marijuana and establish probable cause.  Finally, all items seized under the search warrant properly fell within the scope prescribed by the warrant.

<u>FACTS AND PROCEDURAL HISTORY</u>

On November 12, 2011, at approximately 12:46 PM, the Kentucky State Police received an anonymous complaint that someone was growing marijuana indoors and stealing electricity at 13930 Tompkinsville Road in Barren County, Kentucky.  (White at Hr'g Tr. 5-6; Gov. Ex. 15 warrant affidavit).  Around 1449 hours (2:49 PM), State Troopers Daniel White and Jeremy Hodges drove to the address to investigate.  (White at Hr'g Tr. 6; Hodges at Hr'g Tr. 49, 58).  At the property, they found an open iron gate, designating the property as lots 13920 and 13930, sitting at the beginning of a gravel driveway.  (White at Hr'g Tr. 6-7; Hodges at Hr'g Tr. 49; Gov. Ex. 1,2).  They proceeded to drive down the driveway.  (White at Hr'g Tr. 8; <u>see</u> Hodges at Hr'g Tr. 49-50; Gov. Ex. 20; Def. Ex. 1).

The driveway split into a "Y" shape dividing two residences, with no postal numbers attached to either.  (White at Hr'g Tr. 8; Hodges at Hr'g Tr. 49).  Trooper Hodges made a guess and stopped

2

at the mobile home on his right.  (White at Hr'g Tr. 8-9;  Hodges
at Hr'g Tr. 50).  When Trooper Hodges knocked on the door, Shelly
Goheen answered.  (Hodges at Hr'g Tr. 50).  Mrs. Goheen informed
Trooper Hodges that her home was not at lot 13930 and that 13930
was across the road.  (Hodges at Hr'g Tr. 50).  Trooper Hodges
then rejoined Trooper White who had proceeded to the left at the
Y-intersection and driven down the driveway directly to Norris's
mobile home.  (White at Hr'g Tr. 9; Hodges at Hr'g Tr. 50-53).
Trooper White knocked several times on the front door of the
mobile home, but no one answered.  (White at Hr'g Tr. 9-10;
Hodges at Hr'g Tr. 53).  The Troopers noted several other
buildings along the driveway, including a large garage building
with three large garage doors.  (White at Hr'g Tr. 11).  The
Troopers saw a pickup truck parked in front of the garage.
(White at Hr'g Tr. 15-16; Hodges at Hr'g Tr. 53; Gov. Ex.s
7,8,9).  Assuming "that the owner could be working in the
building and not be aware that [the Troopers] were there,"
Troopers White and Hodges proceeded to the garage.  (White at
Hr'g Tr. 12; Hodges at Hr'g Tr. 53).

Trooper White walked towards the garage to knock on the door
while Trooper Hodges began to run the registration of the black
truck, a Chevy Silverado.  (Hodges at Hr'g Tr. 54-55).  As
Trooper White neared the building, he observed a second truck, a
red 1990 Ford F-250, parked under an awning that was attached to

3

the side of the garage.  (White at Hr'g Tr. 15-16; Gov. Ex. 11).
The presence of the second truck "further made [Trooper White]
believe that individuals were working in this building."  (White
at Hr'g Tr. 15-16).  When Trooper White approached within fifteen
to twenty feet of the garage, near the awning, he detected a
strong odor of marijuana.  (White at Hr'g Tr. 13; Hodges at Hr'g
Tr. 55; Gov. Ex. 15 warrant affidavit).  Trooper White then
called Trooper Hodges over, and Trooper Hodges also smelled
marijuana.  (White at Hr'g Tr. 15; Hodges at Hr'g Tr. 55).

Trooper White knocked on the awning-side door and the
driveway-side door to the garage but received no answer.  (White
at Hr'g Tr. 16, 39; Hodges at Hr'g Tr. 57; see Gov. Ex.s 9, 11).
The Troopers walked around the building for their own safety and
found Roger Goheen and John Landrum standing beside the building.
(White at Hr'g Tr. 16; Hodges at Hr'g Tr. 57, 61).  Goheen
offered that the property was Norris's, that Goheen worked for
Norris, and that Norris was not there at the moment.  (White at
Hr'g Tr. 19-20).  Goheen said that Landrum was Goheen's personal
friend who was there temporarily.  (Id.).  Trooper White asked
Goheen if Goheen could call Norris on his cell phone.  (White at
Hr'g Tr. 20-21).  Goheen called Norris and Trooper White spoke
with Norris.  (White at Hr'g Tr. 21).  Trooper White explained
the complaint, and Norris said that there was no truth to the
complaint.  (Id.).  Trooper White asked if Norris would mind the

4

Troopers looking around, and Norris responded, "While you're there, go ahead and look all you want. Just don't go into any buildings." (Id.).

After talking to Norris, Trooper White called the on-call Assistant Barren County Attorney, Doug Hardin, and requested a search warrant for Norris's property. (White at Hr'g Tr. 22-23). Trooper Hodges stayed with Goheen and Landrum while Trooper White left to sign an affidavit and obtain the search warrant. (White at Hr'g Tr. 23). At 4:35 PM, Troopers White and Hodges executed the search warrant. (Gov. Ex. 14).

The search warrant, signed by Barren County District Judge John Alexander, commanded a search of all buildings at 13930 Tompkinsville Road, all vehicles beside the garage, and any people present and the seizure of "any and all items of marijuana . . . including but not limited to plants, seeds, and stems . . . [a]ny and all items of drug paraphernalia, [a]ny and all items used in the cultivation of marijuana . . .[, and] [a]ny and all items used in the trafficking of marijuana or other illegal drugs." (Gov. Ex. 14 Search Warrant at 1). Upon executing the warrant, Troopers White and Hodges found a very large and elaborate indoor marijuana grow operation. (White at Hr'g Tr. 25-26). The garage was filled with 1,267 marijuana plants. (White at Hr'g Tr. 25). Trooper White noted twelve fans operating at a "loud roar" in every grow room in the building.

(White at Hr'g Tr. 26; Gov Ex.s 16-19). The Troopers, along with additional Kentucky State Police and ATF agents, seized marijuana, vehicles, large amounts of cash and coins, two guns (a revolver and a pump shotgun), and various tools and power equipment such as chainsaws and pressure washers.

On December 7, 2011, the grand jury returned an Indictment charging Norris with one count of manufacturing and possessing, with intent to distribute, over one thousand marijuana plants, in violation of 21 U.S.C. § 841(a)(1), and one count of possessing a gun while being a convicted felon, in violation of 18 U.S.C. § 922(g)(1). (R. 11 Indictment). On January 9, 2012, Norris moved to suppress all evidence obtained under the search warrant. (R. 21 Mot. to Suppress Evid.). The Court held a suppression hearing on March 7, 2012. On March 20, 2012, Norris made two filings with the Court: one, he requested the Court take judicial notice of weather data he attached from the source wunderground.com; and two, he requested the Court to reopen the testimony of the suppression hearing. (R. 31 Def. Mot. for Judicial Notice; R. 30 Def. Mot. To Reopen Testimony). The United States, on March 23, 2012, objected to the Defendant's motion to reopen the testimony of the suppression hearing. (R. 32 Gov. Resp. to Mot. to Reopen).

DISCUSSION

Norris advances his argument on several grounds.  First, he complains that Kentucky State Police Troopers had conducted an illegal search into the curtilage of his home.  (R. 21-2 Memo. in Support of Mot. to Suppress Evid. at 7-8).  Second, he complains that, absent the smell of marijuana that Troopers White and Hodges noted during their visit to Norris's property, the subsequently obtained warrant was not supported by probable cause.  (Id. at 10-11).  Third, he complains that Troopers White and Hodges lied about where they smelled marijuana.  (Id. at 11). Fourth, he claims that Troopers White and Hodges had an affirmative duty to leave the property and obtain a warrant after they smelled marijuana.  (Id. at 12).  Finally, he complains that, in executing the warrant, police seized items that were outside the scope of the warrant.  (Id. at 12-13).  Except for the contention that without the marijuana smell there might not have been probable cause, those arguments fail.

I.   The Troopers Did Not Conduct an Illegal Search Into the
     Curtilage of Norris's Home.

Norris claims that Troopers White and Hodges "conducted an illegal search," (R. 21 Mot. to Suppress Evid. at 1), by "t[aking] an illegal and circuitous route . . . to explore the property of Dallas Norris, looking for a marijuana grow operation."  (R. 21-2 Memo. in Support of Mot. to Suppress Evid.

7

at 7).  Norris strongly implies a belief that the alleged search was illegal because it infringed upon the curtilage of his house.

The space fifteen to twenty feet from the multi-bay garage where Troopers White and Hodges smelled marijuana did not constitute protected curtilage where Norris had a reasonable expectation of privacy.  In determining that a driveway accessible to the public was not curtilage, the Sixth Circuit held that curtilage is "not defined merely by location, but 'by reference to the factors that determine whether an individual reasonably may expect that an area immediately adjacent to the home will remain private.'" United States v. Smith, 783 F.2d 648, 651 (6th Cir. 1986) (quoting Oliver v. United States, 466 U.S. 170, 180 (1984)).  In Smith, the court noted that, as here, nothing obstructed anyone from entering the driveway.  (See White at Hr'g Tr. 6-8; Hodges at Hr'g Tr. 49).  Similarly, nothing obstructed anyone from approaching the garage where Norris maintained his grow operation.  (White at Hr'g Tr. 18; Hodges at Hr'g Tr. 56-57; see also United States v. Hopper, 58 F. App'x 619, 623 (6th Cir. 2003) (unpublished) (area not protected curtilage where defendant "took no special measures to protect the area from open observation")).

Nonetheless, even assuming, *arguendo*, that the area was protected curtilage, the Troopers had a legal right to be there.  "Not every entry on private property by police officers is a

8

Fourth Amendment violation even if there is an encroachment upon the curtilage." Smith, 783 F.2d at 652 (citation omitted). Entry upon the curtilage implicates the Fourth Amendment only where the defendant has a reasonable expectation of privacy in that curtilage "as measured by the Oliver standard." Id. The Supreme Court held in United States v. Oliver, a final appeal from the Western District of Kentucky, that the curtilage was the area "to which extends the intimate activity associated with the sanctity of a man's home and the privacies of life." Oliver, 466 U.S. at 180 (quotation omitted). The driveway fifteen to twenty feet from Norris's garage was not an extension of the sanctity of his home. It was readily accessible from the public highway, unobstructed, and entirely visible. (See White at Hr'g Tr. 7-8, 18; Hodges at Hr'g Tr. 56; Smith, 783 F.2d at 651; Gov. Ex. 1,2).

Finally, the Sixth Circuit has held that "law enforcement officials may encroach upon the curtilage of a home for the purpose of asking questions of the occupants," and such an encroachment will not violate the Fourth Amendment. Hopper, 58 F. App'x at 623 (citing United States v. Hammett, 236 F.3d 1054, 1059 (9th Cir. 2001)). The courts have long upheld a "knock-and-talk" exception to the Fourth Amendment which allows police to encroach upon an otherwise protected area to carry out their investigative function. The Sixth Circuit in Hardesty v. Hamburg

Township unambiguously defined that right of lawful encroachment: "[W]e hold that, where knocking at the front door is unsuccessful in spite of indications that someone is in or around the house, an officer may take reasonable steps to speak with the person being sought out even where such steps require an intrusion into the curtilage." Hardesty v. Hamburg Twp., 461 F.3d 646, 654 (6th Cir. 2006). In Hardesty, the court was addressing whether an officer could proceed from the front door to the back door, an intimate part of the house which is much more clearly "curtilage" than a multi-bay garage on an open driveway. Because Troopers White and Hodges had indications (namely, parked vehicles) that they would find someone to interview around the garage, they did not violate the Fourth Amendment when they knocked on the front door, received no answer, and then walked down the driveway towards the garage.

Norris cites the Fifth Circuit case of United States v. Vega, 221 F.3d 789 (5th Cir. 2000), for the contention that the Court should suppress evidence where officers smelled marijuana only after entering the curtilage. Norris reads Vega improperly. In Vega, the officers smelled marijuana only after manufacturing an exigency and entering into the defendant's residence without a search warrant. Id. at 798-800. The parties never litigated an issue of curtilage in Vega. Had Troopers White and Hodges entered Norris's mobile home without a search warrant or exigency

10

and only then smelled marijuana, the instant case would be very different.

The Troopers did not take a circuitous path or "roam . . . the neighborhood." (R. 21-2 Memo. in Support of Mot. to Suppress Evid. at 7). They did not "explore" the property. (Id.). Every move the Troopers made was purposeful and legal. They drove directly from the public highway through an open gate, and they split up to knock and inquire at both homes. They then walked down the driveway past several other buildings directly to the garage, because there was a truck parked at the garage and they believed someone might be working there. They found a second truck parked at the garage which further increased their belief someone was around. They walked around the side of the garage to continue to search for someone and to secure the premises after they had smelled marijuana and then knocked on the doors, but they received no response. Thus at no point did the Troopers "conduct an illegal search" while "looking for a marijuana grow operation." (Id. at 7-8).

II. The Evidentiary Record Does Not Show That the Troopers Lied About Where They Smelled Marijuana.

Norris claims that the Troopers' "assertion of having smelled [marijuana] 15 feet to the southwest of the outbuilding is obviously false." (R. 21-2 Memo. in Support of Mot. to Suppress Evid. at 11). Norris supports that argument only with conclusory allegations that the wind was blowing "out of the

11

southwest at 10 to 15 miles per hour." (Id.).  Accordingly, he requests that the Court "take[] judicial notice of the weather reports on the day of the search that the wind was generally out of the southwest."  (R. 21-1 Order Suppressing Evid. at 2 (emphasis added); R. 31 Req. for Judicial Notice).  Norris supplements that request with weather measurements taken at the Glasgow Municipal Airport.  (R. 31 Req. for Judicial Notice at 1 and attachs.).[1]

Norris's allegations about the wind are not substantiated by the evidentiary record.  Weather conditions at the airport were very likely different from weather conditions at Norris's property.  According to Google Maps, the Glasgow Municipal Airport is over twenty miles from Norris's property. Trooper White testified that it was "not windy at all" at the property during the afternoon and that it was "a pleasant day."  (White at Hr'g Tr. 16-17, 33).

An airport would be cleared of trees and other obstructions to reduce hazards to aircraft.  In fact, the Glasgow Municipal Airport has a single mile-long runway with no obstructions.  FAA, Airport/Facility Directory, Southeast U.S., KGLW (2011) (available at http://www.airnav.com/airport/KGLW).  As well,

---

[1] Norris's weather reports are METARs.  "A METAR is a report of weather conditions at an airport at a given time."  Glorvigen v. Cirrus Design Corp., 581 F.3d 737, 741 n.3 (8th Cir. 2009) (emphasis added).

12

METAR wind reports like Norris's are generated by wind sensors as part of an Automated Weather Observation System.  See FAA Advisory Circular 150/5220-16D, Automated Weather Observing Systems (AWOS) for Non-Federal Applications, § 3.5 (Apr. 28, 2011) (available at http://www.faa.gov/documentLibrary/media Advisory_Circular/150-5220.16D.pdf).  The "nominal height" of one of these sensors mounted on a tower is thirty to thirty-three feet above the ground to keep it clear of obstructions.  Id.; FAA Order No. 6560.20B, Siting Criteria for Automated Weather Observing Systems (AWOS), § 3.5 (July 20, 1998) (available at http://www.faa.gov/documentLibrary/media/directives/ND/ND6560-20b .pdf) (also requiring a wind sensor to be fifteen feet above all obstructions within a five-hundred-foot radius).  In contrast, Norris's garage is on the ground surrounded by "a wooded area" with trees and brush, as well as, additional building structures to obstruct the wind.  (Hodges at Hr'g Tr. 59; Gov. Ex.s 6-8, 12,13,20; Def. Ex. 1,2; R. 21-2 Memo. in Support of Mot. to Suppress Evid. at 15 ("the curtilage is . . . surrounded on three sides by un-cleared, densely treed woods")).

Moreover, the prevailing wind is not the only factor in whether a smell emanating from inside a building could be completely undetectable fifteen feet from one corner of the building.  As Trooper White described, there was a constant "roar" of fans circulating air inside the garage.  (White at Hr'g

13

Tr. 26).  A gable vent is also visible on the western end of the garage above the awning in both Norris's Exhibit 2a and the United States's Exhibits 8 and 10, while the large front face of the garage has no similar ventilation.  If the smell of over twelve hundred marijuana plants circulated inside the garage, it could escape through the vent on the western wall.  Finally, the awning on the western end of the building nearest Trooper White's approach is fully enclosed to the west but open to the north and south.  (White at Hr'g Tr. 15).  That enclosure, which contains a window, doorway, and garage door opening, and is directly below the gable vent, could trap and direct the smell emanating from any or all of these openings on that side of the structure. (See Gov. Ex.s 8,10,11). In conclusion, the evidence wholly supports the Troopers' testimony that they were standing within fifteen to twenty feet of the southwest corner of the garage when they smelled marijuana.  Norris's allegations to the contrary are without merit.

III. Nothing Seized Fell Outside the Scope of the Warrant.

Norris claims that "numerous items were seized, just because they could be sold for profit and not at all because they were listed in the warrant or related to the crime." (R. 21-2 Memo. in Support of Mot. to Suppress Evid. at 13).  The only things to which he specifically objects are the seizures of a Kubota tractor's backhoe attachment, pressure washers, collectable

14

coins, and firearms.  At the suppression hearing, defense counsel, however, only questioned the Troopers about the vehicles and power tools and, furthermore, offered no proof to even suggest that any seized item was taken outside the mandate of the search warrant.  All of the items seized fall within the scope of the warrant.

"[I]tems to be seized pursuant to a search warrant must be described with particularity to prevent the seizure of one thing under a warrant describing another in violation of the Fourth Amendment."  United States v. Richards, 659 F.3d 527, 536-37 (6th Cir. 2011).  Where officers executing a search warrant seize items outside the scope of the warrant, the proper remedy is suppression of those items not covered by the warrant.  See, e.g., United States v. Sanchez, 509 F.2d 886 (6th Cir. 1975) (commanding suppression of explosives found under a search warrant for narcotics and held to be outside the scope of that warrant).  Even when police seize items that are not listed in the warrant, the Court should not suppress all the items seized.  United States v. Lambert, 771 F.2d 83, 93 (6th Cir. 1985).  Only a "flagrant disregard for the limitations of a search warrant" could invalidate an entire warrant and then only if that flagrant error effectively converted the warrant to an impermissible general search.  Id.

15

The warrant in this case said "any and all items of marijuana . . . including but not limited to plants, seeds, and stems . . . [a]ny and all items of drug paraphernalia, [a]ny and all items used in the cultivation of marijuana . . .[, and] [a]ny and all items used in the trafficking of marijuana or other illegal drugs." (Gov. Ex. 14 Warrant at 1).  Trooper White, when cross-examined regarding the Defendant's truck, stated, "We believed that the majority of everything that was there came from the trade of cultivating and trafficking in marijuana". (White Hr'g Tr. 45). Power tools, such as the tractor, the pressure washers, and the chainsaws, are tools for conducting a sophisticated grow operation like that in Norris's garage.  They are "items used in the cultivation of marijuana" in the language of the warrant.  Tools can be used to move potting soil and marijuana plants, or in the case of pressure washers, to clean necessary equipment and maintain everything in working order, or to remove from surfaces incriminating resin and residue accumulated during cutting, drying, or baling marijuana.  Outside the garage, tractors, trucks, and power tools help to maintain the property to keep up an outside appearance of legitimacy.  Trucks and tractors also help move large quantities of soil, plants, and other paraphernalia.  Coins and cash are clearly items "used in the trafficking of marijuana."  Marijuana operations, especially of this caliber, entail large amounts of

16

money.  Cash or anything that has intrinsic value can be used in trade for marijuana or otherwise to launder and hide dirty money.

Further, the Supreme Court has held that "[i]n the narcotics business, firearms are as much 'tools of the trade' as are most commonly recognized articles of narcotics paraphernalia." Ybarra v. Illinois, 444 U.S. 85, 106 (1979) (citation and internal quotation marks omitted).  Congress has provided certain statutory proscriptions against the use of firearms in drug trafficking.  See, e.g., 18 U.S.C. § 924(c)(1)(A) (mandating a minimum five-year consecutive sentence for anyone who uses, carries, or possesses a firearm during or in relation to a drug-trafficking crime).  The United States Sentencing Commission has provided equivalent rules in the Sentencing Guidelines.  See, e.g., USSG §2K2.1(b)(6)(B) (mandating a four-level increase in offense level, or an increase to level eighteen, for use or possession of a firearm in connection with a felony).  The revolver and shotgun, as common tools of the drug trade, can be rightly seized under the warrant as "items used in the trafficking of marijuana or other illegal drugs." (See Gov. Ex. 14 Warrant at 1).

> IV.  The Troopers Were Not Under a Duty to Cease Their Attempt to Interview Someone and Immediately Obtain a Search Warrant.

Norris complains that "there was no need to continue the search by wandering around to the rear of the buildings. . . ."

(R. 21-2 Memo. in Support of Mot. to Suppress Evid. at 12).  As
noted above, nothing the Troopers did constituted a search under
the Fourth Amendment, let alone an illegal one.  Their walk from
the front door of Norris's mobile home to and around the garage
was a reasonable attempt to locate someone to speak to "even
where such steps require[d] an intrusion into the curtilage."
Hardesty v. Hamburg Twp., 461 F.3d 646, 654 (6th Cir. 2006).  The
Troopers' initial investigation was not over just because they
smelled marijuana near the southwest corner of the building and
established probable cause to obtain a search warrant.

Norris cites several cases, including United States v.
Chaar, 137 F.3d 359, 363 n.6 (6th Cir. 1998), for the contention
that Troopers White and Hodges should have immediately ceased
their investigation and obtained a warrant rather than continue
around the building to eventually locate Goheen and Landrum.  He
does not, though, argue that that action somehow invalidated the
warrant or that he is entitled to some remedy for the alleged
transgression.  Still, Norris misreads the case law.

In Chaar, the Sixth Circuit ultimately upheld, under the
"good faith" exception of United States v. Leon, 468 U.S. 897
(1984), a search of a storage locker that was based on a warrant.
The police in Chaar did not conduct a "warrantless search" as
Norris alleges occurred in the instant case.  Footnote 6 of the
majority opinion, to which Norris cites, simply analyzes the

search as though it had been warrantless to determine whether the search was otherwise justified under an exception to the Fourth Amendment's warrant requirement.  The court said that the "exigent circumstances" exception was inapplicable, because the locker could have been guarded by one officer while another left to obtain a warrant.  Norris seems to use that language to suggest that Troopers White and Hodges should have left immediately to obtain a warrant.  In fact, Trooper White did leave while Trooper Hodges stayed behind to guard the premises, exactly as the court suggested in Chaar.  But Chaar does not say that officers must obtain a warrant as soon as they establish probable cause.  Rather, Chaar holds that a warrant would have been necessary only to actually search the inside of the storage locker.  Here, the Troopers did not search the garage until they had a warrant and they were otherwise legally on the premises in their investigatory capacity at all times.

The rest of Norris's cited cases equally fail to support his theory.  In Illinois v. McArthur, the Supreme Court upheld a warrantless seizure based on the exigency exception where officers "had good reason to fear that, unless restrained, [the suspect] would destroy the drugs before they could return with a warrant."  531 U.S. 326, 332 (2001).  In United States v. Carter, the dissent, to which Norris presumably cites, argues against a warrantless search where the premises "could . . . have been

19

impounded, [the suspect] ordered to remain in view, and a warrant obtained either in person or by telephone." 315 F.3d 651, 662 (6th Cir. 2003) (dissent). The majority, though, calls that contention "unpersuasive" while upholding the search on grounds of exigent circumstances. Id. at 657 n.7. In Segura v. United States, 468 U.S. 796 (1984), the Supreme Court addressed the admissibility of evidence obtained independently from an invalid search. But the Segura majority upholds an otherwise illegal entry into and impoundment of an apartment for nineteen hours before a search warrant could be obtained. And Norris cites United States v. Crespo de Llano, 838 F.2d 1006 (9th Cir. 1987), for the Ninth Circuit's following the Segura Court. All of those cases either uphold a warrantless search based on the exigency exception to the warrant requirement, or they uphold a warrantless entry and impoundment of a suspect's property until a search warrant can be obtained. Those cases would have allowed Troopers White and Hodges to break into the garage and secure the interior for the purpose of preventing destruction of evidence until the police could obtain a search warrant. The cases do not mandate, as Norris contends, that the officers immediately leave to obtain a warrant. Trooper Hodges essentially impounded the garage, as in Segura, by staying there until Trooper White returned with the warrant. Walking around the side of the building was justified both to ensure Trooper Hodges's safety

20

during the impoundment, (see White at Hr'g Tr. 16), and to
continue to try to locate someone to interview.

V.   The Troopers' Investigation Was Wholly Legal.

Every action Troopers White and Hodges took was within the
bounds of the Fourth Amendment.  They entered the property from a
public highway via an unobstructed driveway.  They walked to
Norris's front door, unobstructed and visible, to knock and try
to talk with someone.  When no one answered, they walked to
another unobstructed area where vehicles were parked to attempt
to locate someone.  Even if they encroached upon the curtilage,
and even if that curtilage was protected as an extension of the
"sanctity of a man's home," they were taking reasonable measures
to locate someone for the purpose of asking questions of the
occupants in light of no one's answering the front door.  The
evidentiary record supports the fact that they could smell
marijuana from fifteen to twenty feet southwest of the garage.
They were under no legal obligation to immediately secure the
premises and obtain a warrant, although they did that after
finally locating someone and concluding their initial
investigation.  Finally, everything seized was within the scope
of the search warrant.

VI.   The "good-faith" exception of Leon applies here.

Trooper White's affidavit set forth sufficient probable
cause that the Troopers were justified in relying on it.

21

Where executing officers act in "objectively reasonable reliance on a subsequently invalidated search warrant," courts will not suppress evidence that the officers obtain. See United States v. Leon, 468 U.S. 897, 922 (1984). In determining whether this good-faith exception ought to apply, the Court determined that it must "weigh[] the costs and benefits of preventing the use in the prosecution's case in chief of inherently trustworthy tangible evidence obtained in reliance on a search warrant issued by a detached and neutral magistrate that ultimately is found to be defective." Id. at 907. In weighing the costs and benefits, the Court recognized the "substantial social costs" of the exclusionary rule because of its interference with the truth-seeking functions of judge and jury. Id. (citing United States v. Payner, 447 U.S. 727, 734 (1980)). Further, when officers act in good faith, granting defendants an exclusionary privilege that results in a windfall undermines and "offends basic concepts of the criminal justice system." Id. (citing Stone v. Powell, 428 U.S. 465, 490 (1976)). Because of the high societal cost of exclusion, the Court determined that "[c]lose attention" must be paid to the "remedial objectives" and purposes behind the exclusionary rule. Id. at 908.

The remedial objective of the exclusionary rule is to deter police misconduct. Id. at 916. Thus, to have any purpose, the exclusion of unlawfully obtained evidence "must alter the

behavior of individual law enforcement officers or the policies of their departments." Id. at 918.  With these factors balanced, the Court determined that "suppression of evidence obtained pursuant to a warrant should be ordered only on a case-by-case basis and only in those unusual cases in which exclusion will further the purposes of the exclusionary rule." Id.  Therefore, when the remedial objective of the Fourth Amendment will be served, exclusion is the appropriate remedy.  When no deterrence can be expected to result from suppression then society ought not be forced to bear the cost of exclusion.

The Court found that when officers act in objective good-faith reliance on a warrant, suppression "cannot be expected, and should not be applied, to deter objectively reasonable law enforcement activity." Id. at 919.  This approach recognizes that "[r]easonable minds frequently may differ" and therefore, when police officers rely, in objective good faith, on a warrant, but a court later finds the warrant was defective, a punishment inflicted upon the police officers and society serves no purpose. Id.

Furthermore, as the Supreme Court very clearly noted in United States v. Peltier, 422 U.S. 531, 539 (1975):

> The deterrent purpose of the exclusionary rule necessarily assumes that the police have engaged in willful, or at the very least negligent, conduct which has deprived the defendant of some right. By refusing to admit evidence gained as a result of such conduct,

the courts hope to instill in those particular investigating officers, or in their future counterparts, a greater degree of care toward the rights of an accused. Where the official action was pursued in complete good faith, however, the deterrence rationale loses much of its force.

Id. The purposes of the exclusionary rule are served where "it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment." Id. at 542. Where the officers act in reliance on the warrant and an objectively reasonable interpretation of it, as they did here, suppressing the evidence will do nothing to deter police conduct because the police did not do anything unlawful.

Here, the Troopers did nothing improper. Trooper White presented the judge with an affidavit that established probable cause that evidence of criminality would be found in the location identified. The affidavit is not "so lacking in indicia of probable cause" as to overcome the "great deference" given to the judge's determination in authorizing the search.

24

<u>CONCLUSION</u>

The Court should deny Norris's motion to suppress evidence obtained under the search warrant.

Respectfully submitted,

DAVID J. HALE
United States Attorney

/s/ Mac Shannon
Assistant U.S. Attorney
717 West Broadway
Louisville, Kentucky 40202
(502) 625-6294
(502) 582-5067 (fax)

<u>CERTIFICATE OF SERVICE</u>

On March <u>27</u>, 2012, I electronically filed this document with the Clerk of the Court through the ECF system, which will send a notice of electronic filing to all counsel of record.

/s/ Mac Shannon
Assistant U.S. Attorney

25