```
                UNITED STATES DISTRICT COURT
                WESTERN DISTRICT OF KENTUCKY
                      AT BOWLING GREEN
```

UNITED STATES OF AMERICA                                    PLAINTIFF

v.                                     CRIMINAL ACTION NO. 1:11-CR-34-R

DALLAS NORRIS                                               DEFENDANT

### SURREPLY TO REPLY MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO SUPPRESS EVIDENCE

In his reply, Dallas Norris misstates the facts without citing to the evidentiary record. Due to the scope of the unsupported misrepresentations, the United States files this surreply to clarify the record.

A.  **The Curtilage Stipulation**

Norris claims that the United States stipulated "in open [c]ourt" that the area where two Kentucky State Police Troopers smelled marijuana on his property was protected curtilage. (R. 36 Reply Mem. in Support of Def.'s Mot. to Suppress Evid. at 1-2 [hereinafter Def.'s Reply] ("Defendant attempted to obtain the testimony of Roger Goheen . . . [t]his banter led to the stipulation that the area was curtilage.")) That is not true[1].

---

[1] Not only is this untrue but many of the "facts" the Defendant alleges in support of his contention are utterly false. For example, the Defendant alleges that "the government's own witnesses testified ... that there were "no trespassing" signs posted and that there was a fence in the rear...". (R.36 Def.'s reply at 1). Trooper White repeatedly testified that there were no visible trespassing signs. (R. 28 Hr'g Tr. at 8, 29). Trooper White also testified he never saw a fence. (Id. at 38). The United States' exhibits as well as Defendant's exhibits evidence no visible "no trespassing" signs and no clear image of a fence in the rear of the property. (See id. 37-38, 87).

At the suppression hearing of March 7, 2012, defense counsel asked that the United States stipulate that the area surrounding the garage where Norris grew marijuana was curtilage[2]. (R. 28 Hr'g Tr. at 77, 84-85). The Court specifically queried the United States regarding the stipulation stating: "Well, I don't think they're going to admit that it's not curtilage. Am I correct on that?" (Id. at 77). The United States did not so stipulate and responded that whether it was curtilage or not would not matter for the pivotal issue before the Court. (Id.) The Court similarly expressed doubt that it would matter as well, to which, counsel for the Defendant immediately responded: "I think I'm going to need Mr. Goheen to testify." (Id. at 77-78). Defense counsel attempted to call Roger Goheen as a defense witness, but the Court found that Goheen had a Fifth Amendment right against self-incrimination and needed his own counsel. (Id. at 74). When asserting that he would call Goheen to testify about whether or not the area was curtilage, defense counsel said: "This curtilage question I think is an important question, and if we can just agree that that's what this property is." (Id. at 84). The United States did not agree to the stipulation, and in response to the Court's direct questioning the United

---

[2]In fact, the United States did not agree to any of the multiple stipulations requested by the Defendant. (R. 28 Hr'g Tr. at 31-32 (Defendant requested a stipulation that no exigent circumstances existed and a stipulation as to prevailing wind.))

2

States reiterated the position that, whether the area was curtilage or not, the Troopers had a lawful right to be there. (Id. at 84-85).  Again, defense counsel asked: "If they'll stipulate that this area inside the fence is curtilage--," (Id. at 85), and again, the United States did not agree to stipulate.

Eventually, as a direct result of the lack of a stipulation regarding the curtilage, the Court accepted a proffer from defense counsel regarding the testimony of Joel House, a defense witness not present at the hearing.  (Id. at 89).  Defense counsel proffered that House would testify that he was familiar with the property; he had been there watching the wildlife in the evening, drinking beer; he had worked on the premises; the fence was 75 feet back from the building; that the area was mowed; maintained for personal use; and that it was within 120 feet of the trailer that was 65 feet long. (Id.).  The Court accepted the proffered testimony without objection from the United States. (Id.).  The proffered testimony was not a stipulation to the legal conclusion that the area was curtilage, but rather an inclusion of facts into the record for the Court's consideration.

On March 7, 2012, the United States did not enter into any stipulations with the Defendant and his unsupported claim otherwise is false.

3

B.   <u>Shelly Goheen as an "Occupant" of Norris's Farm</u>

Norris complains that Troopers White and Hodges were on the property only to ask questions of the occupants, and that "these officers had already asked questions of one of the occupants of the farm, Shelly Goheen."  (R. 36 Def.'s Reply at 2).  Norris says that Goheen informed the officers that Dallas Norris was away.  (<u>Id.</u>).  That assertion is unsupported by the record, and the reply mischaracterizes Shelly Goheen's residence and the brief meeting between Goheen and Trooper Jeremy Hodges.  Shelly Goheen is not, in fact, a resident of 13930 Tompkinsville Road, the residence of the Defendant and the subject of the complaint.

As Trooper White testified at the hearing, the open gate at the front of the property listed two residences, lots 13920 and 13930.  (R. 28 White at Hr'g Tr. 7).  The tip which led the Troopers to investigate the property specified only 13930 Tompkinsville Road.  (<u>Id.</u> at 6).  Because the driveway at the property split into a "Y" shape leading to two residences, with no numbers attached to either, the officers split up.  (<u>See</u> White at Hr'g Tr. 8-9 ("There was no distinction as to which residence was going to be 13930. I drove to the left and Trooper Hodges went to the right to try to find which residence would have been 13930.")).  When Trooper Hodges drove to the mobile home on the right and knocked on the door, Shelly Goheen answered.  (R. 28 White at Hr'g Tr. 8-9;  Hodges at Hr'g Tr. 50).

4

According to Trooper Hodges's testimony on direct, Shelly Goheen only told Hodges that he was at the wrong location, and "[t]he house you're looking for is over there." (R. 28 Hodges at Hr'g Tr. 50). Hodges then immediately drove to meet Trooper White at Norris's mobile home. (Id. at 52). Trooper White, on cross-examination, did testify to his "understanding" and his belief that Goheen told Hodges that Norris wasn't home. (R. 28 White at Hr'g Tr. 44). But White was not there for any part of that conversation. No party to that conversation testified that Shelly Goheen ever told the Troopers that Norris wasn't home.

Moreover, Shelly Goheen was not "one of the occupants of the farm." The farm was lot 13930; the Goheens' house was 13920. Shelly Goheen was very explicit when she told Trooper Hodges that he was at the wrong residence. Trooper Hodges drove to meet Trooper White because he realized he was at the wrong address. (See R. 28 Hodges at Hr'g Tr. 52). Thus the officers had not yet met any occupant of the property subject of the complaint and were well within their right to approach the garage to attempt to interview someone who lived there. See Hardesty v. Hamburg township, 461 F.3d 646 (6th Cir. 2006).

C.  The Weather Conditions

Norris also asserts as true that "the weather in the area that day was common knowledge," that "the Government's witnesses did not contradict the weather facts asserted by Defendant and

5

the Government did not assert ANY other set of conditions of the weather." (R. 36 Def.'s Reply at 3). Those allegations, offered without supporting citations, are patently false. Norris argued that the wind was blowing from the southwest "at 10 to 15 miles per hour," (R. 21-2 Memo. in Support of Mot. to Suppress Evid. at 11), and submitted weather measurements from the Glasgow Municipal Airport in support of that claim. (See R. 31 Req. for Judicial Notice and attachs.). But Trooper White testified on direct that it was "not windy at all" at the property during the afternoon and that it was "a pleasant day." (R. 28 White at Hr'g Tr. 16-17, 33). Specifically, White stated: "As far as referring to wind, it was not windy at the time that we were there initially. It became windy that evening as we were dismantling the indoor grow.[3]" (Id. at 33). The United States also opposed Norris's submission of the airport weather reports in its response. (R. 33 Response to Mot. to Suppress Evid. at 11-12). Norris's bald assertion that "[t]here is no reason not to accept [his] version of the weather," (R. 36 Def.'s Reply at 3), is unsupported by the facts.

The rest of the allegations in Norris's reply are likewise devoid of citations to the record. Because Norris does not support his allegations with record facts, and the facts

---

[3] The Troopers arrived at the property at 2:49 p.m. (1449 hours) and the grow was dismantled later sometime around midnight. (R. 28 White at H'rg Tr. 6; Cruce at H'rg Tr. 72).

presented at the hearing refute his allegations, he has failed to carry his burden.

## CONCLUSION

The Court should deny Norris's motion to suppress.

Respectfully submitted,
DAVID J. HALE
United States Attorney


/s/ Mac Shannon
Assistant U.S. Attorney
717 West Broadway
Louisville, Kentucky 40202
(502) 582-6294
(502) 582-5067 (fax)


## CERTIFICATE OF SERVICE

On April 11, 2012, I electronically filed this document with the Clerk of the Court through the ECF system, which will send a notice of electronic filing to all counsel of record.

/s/ Mac Shannon
Assistant U.S. Attorney