UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN DIVISION
CASE NO. 1:11-CR-00034-R

UNITED STATES OF AMERICA                                        PLAINTIFF

v.

DALLAS NORRIS                                                   DEFENDANT


MEMORANDUM OPINION AND ORDER

Before the Court is Defendant Dallas Norris's Motion to Suppress (DN 21).   On March 7, 2012, a suppression hearing was held in Bowling Green, Kentucky.   Mac Shannon, AUSA, appeared on behalf of the Government.   Vincent F. Heuser appeared on behalf of Norris.   Terri Turner, official court reporter, recorded the proceedings.

The Government offered the testimony of three witnesses, Trooper Daniel White, Trooper Jeremy Hodges, and Special Agent Kevin Cruce.   White and Hodges are employed with the Kentucky State Police and Cruce works for the Bureau of Alcohol, Tobacco, Firearms, and Explosives.   The Court also accepted a proffer introduced by Norris concerning the potential testimony of Joel House.   The parties subsequently submitted briefing on the suppression issues (DN 33; DN 36; DN 37).

Norris has also filed three motions for the Court's consideration.   One contains additional information on the weather conditions for November 12, 2011, near Glasgow, Kentucky (DN 31). The Court accepts the information and incorporates it into the ruling.   Another includes affidavits by Norris and Roger Goheen regarding whether Norris consented to the police staying on his land (DN 30).   Though Norris asks to reopen the hearing to present more testimony on the issues, the Court finds this measure unnecessary.   Rather, it will consider the men's sworn statements in

1

conjunction with the testimony presented at the hearing.   Finally, Norris moves to admit exhibits he failed to offer into evidence at the hearing (DN 34).   The Court will grant this motion.

Accordingly, the Court reviews the briefing by the parties, the testimony at the hearing, the exhibits that were introduced, and the information contained in Norris's motions.

## BACKGROUND

Norris moves to suppress evidence seized from his property in Barren County, Kentucky, as a result of a warrantless search of his property on November 12, 2011, by White and Hodges. The true points of contention are whether White and Hodges violated Norris's Fourth Amendment rights when they drove onto his land, approached an outbuilding behind his home, and walked around the building before seeking a search warrant.

### A.  Description of 13930 Tompkinsville Road

Norris resides at 13930 Tompkinsville Road in Barren County, Kentucky (herein "Property").   The Property is very large and located in a rural setting.   Turning off of Tompkinsville Road, a gravel driveway serves as the main route of ingress and egress for traffic. There is a wooden, lattice-work fence at the start of the driveway, accompanied by a gate on hinges.   The gate bears the numbers "13930" and "13920," denoting the presence of two residences, as well as a "Private Property" sign.   The gate is capable of swinging shut, sealing off access to outsiders.   Past the entrance, the driveway runs west-to-east more than a quarter-mile through an open pasture and into the Property, before branching into two spurs.   The southern spur leads to a mobile home where Roger and Shelly Goheen reside.   The northern spur travels toward a mobile home occupied by Norris and several outbuildings, including a large metal multi-bay building ("Barn").   The Goheen residence and Norris's mobile home are approximately 200 feet from one another.

2

Proceeding up the driveway along the northern spur, a driver would first reach Norris's mobile home on the left ("Home").   The Home is set off from the driveway roughly 35 feet with a well-maintained walkway to the front door.   Past the Home, the driveway continues with three smaller outbuildings flanking it on either side.   The driveway terminates when it reaches the Barn in a circular loop.   The Barn is the eastern most building along the northern spur and the farthest building from the Home, with the distance between the two approximately 75 feet.   Thick woods surround these five structures, but the tree line has been cut back around them to create a clearing in which all five are situated.   The space between the Home, Barn, and three other outbuildings is comprised of a manicured lawn, dotted with residential-landscaping features (birdhouse, birdbath, bushes, etc.).   There is no gate or impediment in the driveway that would prevent a visitor to proceed past the Home and approach the Barn on foot.   A fence is located east of the Barn in the woods but the testifying witnesses do not remember seeing it that day.   In any event, the fence is not visible from the driveway as an individual advances on the Barn from the Home.

The Barn is by far the largest building on the Property, measuring 30 feet by 70 feet.   A gravel parking area is located on one side, and on the opposite side, a fifteen-foot covered metal awning protrudes from the Barn.   This covered space is used for parking vehicles and storing an assortment of machinery and farm-related equipment.[1]

**B.  Testimony by Government witnesses**

On November 12, 2011, White and Hodges were on duty when dispatch informed them that an anonymous call had been received concerning the Property.   The caller told authorities that marijuana was being cultivated indoors on the Property and residents there were stealing

---

[1] The photographic exhibits introduced at the hearing show lumber, bags of concrete, a concrete mixer, ladders, seeders, and a gas can.   A fair amount of trash and leaves have also accumulated under the awning.

electricity.   White and Hodges drove separately to the Property.   Hodges arrived before White, but did not enter the premises until White's arrival at 2:49 p.m.

Taking their respective vehicles, the two officers drove through the open gate and down the driveway toward Norris's residence.   White and Hodges testified there were no obstructions to prevent them from traveling along the driveway.   At the fork, White took the northern spur in the direction of Norris's Home while Hodges drove to the Goheen residence.   Separating was necessary because neither knew which clump of buildings comprised 13930 Tompkinsville Road. White stopped in front of what would later be identified as Norris's Home, went up the walkway, and knocked on the door.   He stated that he intended to inform the owner about their presence and ask for consent to search.   After knocking several times, White ascertained that the Home was empty and walked back to his car parked in the driveway.   Meanwhile, Hodges spoke with Shelly Goheen in the mobile home along the southern spur.   She indicated that 13930 Tompkinsville Road was in the direction White had gone.   She also told Hodges that Norris was presently not at home.   A few moments later, Hodges drove his vehicle up from the southern spur and rejoined White.

From their location in front of the Home, White and Hodges could observe a dark Chevrolet truck in the parking area next to the Barn.   The presence of the vehicle and the well-defined gravel driveway ending at the Barn led the officers to believe the structure was occupied.   The officers also wanted to retrieve the license plate numbers from the truck's tags to confirm that the Home was indeed 13930 Tompkinsville Road.   With these objectives in mind, the two approached the Barn on foot along the driveway.   White says that about fifteen to twenty feet away from the Barn, he detected the strong odor of marijuana.   He called Hodges over to

4

where he was standing and Hodges confirmed the smell of live marijuana plants as well.   White

then knocked on one of the doors but no one answered.

At this point, the officers decided there was enough probable cause for a warrant to search

the premises.   White and Hodges began a protective sweep of the perimeter of the Barn for safety

purposes before one of them drove the thirteen miles to town to retrieve a warrant.   White circled

to the backside of the Barn and walked under the awning and toward the structure's rear.   In a

clearing at the building's rear, White saw two individuals, Roger Goheen and John Landrum.

White spoke with the two men, who informed him that Norris was the owner of the Property and

that he was returning from Louisville, Kentucky.   White then asked Goheen if he would call

Norris's cell phone.   Goheen obliged, and in the ensuing conversation with Norris, White

identified himself and explained his presence on the Property.   White testified that Norris

consented to the officers' request to stay on the premises and look around, but expressly told them

not to go in any buildings.   Norris has submitted an affidavit where he states that he never gave

permission for the officers to stay on his land.   Either way, White told Norris that they would

speak when he returned and terminated the call.

White then left the Property and over the next few hours proceeded to retrieve a warrant

from a state-court judge in Barren County.   It authorized the search of the buildings along the

northern spur, including the Barn, for any items related to marijuana, its cultivation, and its

trafficking.   The warrant was executed later that day and law enforcement discovered a

sophisticated marijuana grow operation, including 1,267 marijuana plants, florescent lights, and

twelve electric fans used in the cultivation process.   Norris returned to the Property at some point

during the search and was confronted by the police upon his arrival.   He consented to the search of

his vehicle following brief discussion with the officers.   He was later arrested for his role in the grow operation.

### C.  Weather on November 12, 2011

The testimony at the hearing supports the Government's contention that the weather was relatively calm on November 12, 2011.   Neither White nor Hodges remembers it being particularly windy from the time they arrived at the Property until they first detected the odor of marijuana.   Cruce testified there was a good deal of wind when he joined the search of Property at 8:00 p.m., but he admits he does not know what the wind was like prior to his arrival.   Norris has submitted evidence that the average wind speed for that day was between 10 and 15 mph from the south-southwest.   Though the intensity of the wind is a point of contention between the parties, all agree that as White and Hodge walked from the Home to the Barn, a south-southwest wind would have blown at their backs and pushed any smells emanating from the structure away from their approach.

### D.  Proffered Testimony of Joel House

Defense counsel relayed during the hearing that Joel House would have appeared at the hearing but for an emergency medical issue with his child.   He would have testified that the area around the Barn was used by Norris and others as a private place for leisure and outdoor recreation. House was prepared to present layman's measurements on the fence behind the Barn – it was 75 feet back from the structure in the woods, within 120 feet from the trailer, and 65 feet long.   The Court accepts this proffer as true and accurate.

### E.  Roger Goheen at the suppression hearing

Goheen was subpoenaed to appear as a witness on Norris's behalf during the suppression hearing.   Norris indicated that Goheen could provide relevant testimony about the structures

located along the northern spur that would tend to show White and Hodges had impermissibly invaded the curtilage when they walked up the driveway.   Defense counsel informed the Court that Goheen was the subject of an ongoing criminal investigation regarding his involvement with the grow operation.   The Court made its concerns known that Goheen would likely need an attorney to represent him at the hearing to ensure he did not make incriminating statements. Goheen's participation became unnecessary when the Court accepted House's testimony.

## DISCUSSION

Norris's motion to suppress contains four chief complaints with the police's conduct.   He states (1) White's and Hodge's presence on the Property constituted a warrantless search, (2) the officers falsely asserted that they smelled marijuana outside the Barn, (3) the anonymous tip lacked sufficient reliability upon which to base the search warrant, and (4) the police exceeded the scope of the search warrant when they seized items that were not connected to criminal activity. The Court will discuss each of these contentions in turn.

### A.  Officers White's and Hodge's actions preceding the search warrant

Norris argues the evidence seized during the search should be suppressed because White and Hodge violated the Fourth Amendment's protections when they approached the Barn on foot and when White circled it after he smelled the marijuana.   Norris declares the Barn is within the curtilage of his residence and should be afforded the same constitutional protections as his Home. The Government counters the Barn is not within the Home's curtilage and thus not protected by the Fourth Amendment, and even if it is, the troopers were allowed to approach the structure pursuant to the knock-and-talk rule.   It also declares that once the officers detected the presence of marijuana, they could perform a protective sweep of the area without implicating Norris's constitutional rights.

7

Initially, the police were permitted to drive onto the Property and proceed unhindered down the driveway.   The gate on Tompkinsville Road was open and there were no obstacles to visitors as they traveled toward the Home.   Legal precedent is resolute that the police may use private roads to visit residences and make queries of the occupants without implicating the Fourth Amendment.   *See United States v. Smith*, 783 F.2d 648, 651 (6th Cir. 1986) (no constitutional violation where officer drove on long, rural driveway up to residence when there "were no obstructions indicating any attempt to limit access to the area around the house"); *see also Nikolas v. City of Omaha*, 605 F.3d 539, 546 (8th Cir. 2010) ("[W]ithout a warrant, [the officer] could enter the property though its open gate and proceed up the driveway to the front door of the main residence to ask for consent to search inside the residence." (citations omitted)); *United States v. Ventling*, 678 F.2d 63, 66 (8th Cir. 1982) ("The absence of a closed or blocked gate in this country creates an invitation to the public that a person can lawfully enter along the driveway during daylight hours to contact the occupants for a lawful request and if the request is refused to leave by the same way." (citation omitted)).   White could also knock on the front door with the intent of asking for consent to search the premise without violating the Fourth Amendment.   *Pritchard v. Hamilton Tp. Bd. of Trustees*, 424 F. App'x 492, 500 (6th Cir. 2011) (citing *United States v. Thomas,* 430 F.3d 274, 277 (6th Cir. 2005)).   The dispositive issue thus becomes whether White and Hodge were allowed to walk to the Barn on the driveway without violating the Fourth Amendment's protections for curtilage?

The Fourth Amendment was established to protect "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."   U.S. CONST. amend. IV.   These constitutional protections extend to the curtilage of the home. *United States v. Jenkins,* 124 F.3d 768, 772 (6th Cir. 1997).   "Curtilage is the land surrounding

8

and associated with the home which 'harbors the intimate activity associated with the sanctity of a man's home and the privacies of life.'"  *Hardesty v. Hamburg Tp.*, 461 F.3d 646, 652 (6th Cir. 2006) (quoting *United States v. Dunn,* 480 U.S. 294, 300 (1987)).

 Presuming that the gravel driveway between the Home and Barn was curtilage, White and Hodge's intention to effectuate a knock-and-talk encounter would forgive the intrusion.[2] "[W]here knocking at the front door is unsuccessful in spite of indications that someone is in or around the house, an officer may take reasonable steps to speak with the person being sought out even where such steps require an intrusion into the curtilage."  *Id*. at 654.   The police are often granted license to approach outbuildings and other areas of the property for the purpose of initiating contact with a resident.  *See e.g.*, *id*. (officers permitted to go to back door of residence and knock); *United States v. Taylor*, 458 F.3d 1201, 1205 (11th Cir. 2006) (police could move away from door toward man coming out of barn); *United States v. Raines*, 243 F.3d 419, 421 (8th Cir. 2001) ("[L]aw enforcement officers must sometimes move away from the front door when attempting to contact the occupants of a residence."); *United States v. Noriega*, No. 09-CR-00240, 2010 WL 348350, at *5 (S.D. Ala. Jan. 22, 2010) (officer permitted to leave front door, enter back yard and speak with residents).

 From the porch of the Home, White and Hodges saw the Chevrolet truck parked in front to the Barn.   It was the only vehicle visible to the officers in the cluster of buildings on the northern spur, located in what was clearly a parking lot and positioned next to the largest structure on the Property.   Approaching the structure along the open gravel driveway was the next logical and reasonable step to seek out and speak with the Property's owner.  *See Hardesty*, 461 F.3d at 654; *United States v. Diaz*, No. 1:09-CR-9, 2009 WL 3675006, at *1 (N.D. Fla. Oct. 30, 2009) (officers

---

2  Because it is unnecessary to determine if the driveway is curtilage, the Court does not reach the issue.

permitted to approach an unobstructed barn in search of resident where truck parked outside). The officers were also uncertain what the resident's car looked like or the identity of the owner. One purpose for moving to the Barn was to retrieve the license plate number of the truck, confirm they were at the correct address, and discover the name of the owner.   The Court cannot say these were illegitimate reasons for proceeding to the building.   Lastly, Norris urges suppression because Shelly Goheen told Hodges that the Home was empty.   However, Norris has not provided, nor has the Court encountered, legal precedent stating that when the police are told by a neighbor a building in unoccupied, the police must abandon any further attempt to make contact with its owner.

Next, Norris contends the officers violated his rights by conducting the protective sweep around the Barn after White smelled the marijuana.   Officers may conduct protective sweeps of an area as a cautionary measure when a reasonably prudent officer would believe the area to be searched contains an individual posing a danger to the officers at the scene.   *See Maryland v. Buie*, 494 U.S. 325, 334 (1990).   In *United States v. Taylor*, 248 F.3d 506 (6th Cir. 2001), the Sixth Circuit upheld a protective sweep performed by the police in a defendant's apartment after officers saw drug paraphernalia in plain view.   *Id*. at 512-13.   While an officer left the scene to secure a warrant, those remaining in the apartment fanned out and checked the apartment for other occupants.   *Id*.   They discovered a man hiding in the bathroom and several bags of marijuana in the closet.   *Id*.   The court of appeals sanctioned the protective sweep, finding that the police could conduct a limited search under the circumstances to ensure the safety of the officers left behind at the scene to wait for the warrant's arrival.   *Id*. at 513.   It warned that "the sweep must be limited to a cursory search of the premises for the purpose of finding persons hidden there who would threaten the officer's safety."   *Id*. at 513-14.   Courts have condoned sweeps in and around

10

outbuildings when the circumstances call for such precautions.   *See e.g.*, *United States v. Kessler*, 165 F.3d 24 (5th Cir. 1998) (security sweep inside of barn); *United States v. Carpenter*, No. 3:10-CR-109, 2011 WL 540528 (E.D. Tenn. Jan. 11, 2011) (protective sweep of outbuilding); *United States v. Ashby*, No. 3:04-CR-105-C, 2006 WL 120238 (W.D. Ky. Jan. 17, 2006) (sweep of sheds and outbuildings).

White's sweep around the Barn was justified to ensure the safety of himself and Hodges. The officers possessed probable cause to believe there was a large quantity of marijuana in the Barn, in light of the structure's size and the intensity of the odor.   The placement of the truck in this secluded setting was a legitimate basis to anticipate the presence of another person nearby. The remoteness of the Property and the distance of the Barn from Tompkinsville Road meant that one of the officers would likely be left by himself to guard the scene for a lengthy period of time. Faced with the probability of leaving one officer alone next to a large quantity of drugs, the officers were wise to confirm whether anyone else was in the vicinity.   The scope of the sweep was limited, as neither officer entered the Barn and the closest White ever got to the structure was passing beneath the awning as he made his way to its rear.   Once on the backside of the Barn, White indeed encountered Goheen and Landrum in the clearing.   All of these factors validate reconnoitering the Barn before the two officers separated.

To the extent Norris alleges White and Hodges violated the Fourth Amendment by continuing to search the Property after they encountered the smell of marijuana, the Court disagrees with this characterization.   The uncontroverted testimony at the hearing underscored that the purpose for walking to the other side of the Barn was to secure the area in advance of leaving an officer on the scene.   Norris's assertions that White engaged in an expanded search

11

rather than a protective sweep are uncorroborated and speculative.   The Court accepts the testimony presented before it and concludes no constitutional violation occurred.

In sum, the Court finds no evidence to suggest White and Hodges violated the Fourth Amendment's protections by entering the Property, knocking on the Home's door, approaching the Barn on the gravel driveway, and performing the protective sweep before securing the search warrant.

### B.  Assertions by Officers White and Hodges that they smelled marijuana

Norris disputes that White and Hodges were able to smell marijuana in the driveway 15 to 20 feet away from the Barn.   He states the wind blowing from the south-southwest would have pushed any aroma from the Barn away from the officers' location.   Alternatively, he proposes that the only way the officers could have detected the odor was by entering the Barn and/or circling around to the rear of the building.   Norris essentially accuses White and Hodges of falsifying their testimony and the affidavit supporting the search warrant.

Insofar as Norris challenges the credibility of the officers and their statements about smelling the marijuana in the driveway, the Court is not persuaded.   Each testified that they were familiar with the scent of marijuana through their previous training and experience.   Both said the smell was powerful near the Barn, with Hodges characterizing the intensity as a "knock-you-down-in-the-face type odor."   Neither recalls it being particularly windy in the driveway such that the men could not detect the large marijuana grow operation from this close proximity.   The Court accepts the veracity of the testimony offered by Hodges and White on this point.[3]

---

3 To the extent Norris challenges the accuracy of the warrant's affidavit as containing reckless or false statements under *Franks v. Delaware*, 438 U.S. 154 (1978), he has not met his burden.   He did not make a preliminary showing

### C.  <u>Warrant supported by probable cause</u>

Norris says the warrant was not supported by probable cause because the officers did not possess information on the reliability of the informant.   Such a contention ignores the subsequent corroboration of the tip when the officers stumbled upon the distinct smell of marijuana.   Search warrants are consistently upheld where probable cause is founded on anonymous tips of drug activity followed by the smells of narcotics.   *See e.g.*, *United States v. Yarbrough*, 272 F. App'x 438, 443 (6th Cir. 2007) ("When the smell of marijuana is coupled with an anonymous tip of drug activity, probable cause exists for a search warrant."); *United States v. Elkins*, 300 F.3d 638, 660 (6th Cir. 2002) (anonymous tip and smell of marijuana sufficient for warrant); *see also United States v. Clarke*, 564 F.3d 949, 959 (8th Cir. 2009) (anonymous tip and smell of methamphetamine sufficient for probable cause, but house entered on basis of exigent circumstances).

Norris advances that the search warrant is further flawed because it included the assertion that he consented to the officers staying on the Property.   Gov't Exhibit, 15.   Norris and Goheen submitted affidavits to the contrary.   Even if the Court believed Norris and Goheen's version of events, the exclusion of this statement for the warrant is inconsequential.   Under *Franks v. Delaware*, 438 U.S. 154 (1978), "[i]f the redacted affidavit, purged of recklessly and materially false statements, no longer establishes probable cause, then the court must hold the resulting search warrant invalid."[4]   *United States v. Elkins,* 300 F.3d 638, 649 (6th Cir. 2002) (citing *Franks,* 438 U.S. at 155-56) (footnote omitted).   The precedent for anonymous tips and odors of narcotics establishes that probable cause to search the Property existed with or without Norris's consent to stay.

---

that the statement about smelling marijuana from the driveway was false or reckless.   *Id.* at 155-56.
4 Since Norris declares the statement is false, and because he fails to explain the statement's impact on the search of the Property, the Court has analyzed it under *Franks* and presumes that Norris's main objection to White's allegation of consent arises from its inclusion in the warrant's affidavit.

### D.  Exceeding the scope of the warrant

The search warrant contained the following description of personal property to be seized:

> Any and all items of marijuana or other illegal drugs, including but not limited to plant seeds, and stems.  Any and all items of drug paraphernalia.  Any and all items used in the cultivation of marijuana.  Any and all items used in the trafficking of marijuana or other illegal drugs.

Gov't Exhibits 14 & 15.   The police took 149 items of evidence during the search.   Norris posits the police exceeded this limitation of the warrant when they seized items like a tractor's backhoe attachment, a 4x4 all-terrain vehicle, two trucks, pressure washers, chainsaws, cash, collectable coins, jewelry, and two firearms.[5]   The Government insists these items were used in either the "cultivation of marijuana" or the "trafficking of marijuana or other illegal drugs."

"'Items to be seized pursuant to a search warrant must be described with particularity to prevent the seizure of one thing under a warrant describing another in violation of the Fourth Amendment.'"   *United States v. Richards*, 659 F.3d 527, 536-37 (6th Cir. 2011) (quoting *United States v. Wright,* 343 F.3d 849, 863 (6th Cir. 2003)).   "'The chief purpose of the particularity requirement is to prevent general searches by requiring a neutral judicial officer to cabin the scope of the search to those areas and items for which there exists probable cause that a crime has been committed.'"   *Id*. (quoting *Baranski v. Fifteen Unknown Agents of the Bureau of Alcohol, Tobacco & Firearms,* 452 F.3d 433, 441 (6th Cir. 2006)).   "A search warrant 'will be valid if it is as specific as the circumstances and the nature of the activity under investigation permit.'"   *United States v. Evers*, 669 F.3d 645, 652 (6th Cir. 2012) (quoting *Guest v. Leis,* 255 F.3d 325, 336 (6th Cir. 2001)); *accord United States v. Kimbrough,* 69 F.3d 723, 727 (5th Cir. 1995) ("In

---

5 These are the only items described in Norris's motion that he believes were improperly seized by the police.   The Court therefore assumes the other materials taken by the police have a colorable connection to the drug operation.

14

circumstances where detailed particularity is impossible, generic language is permissible if it particularizes the types of items to be seized.").

Most of the items taken were related to the cultivation and trafficking of marijuana so as to justify their seizure by the police.   The vehicles have a sufficient nexus to the transportation of marijuana and the means to cultivate it.   *United States v. Matus-Beyliss*, No 4:08-CR-00028, 2008 WL 2568271, at *12 (E.D. Mo. June 24, 2008) (car properly seized where there was "fair probability" it was used to transport marijuana and warrant sought "other instruments of the crime").   The same can be said for the firearms, since weapons in plain view may be seized because of their close association to the sale and trafficking of illegal narcotics.   *United States v. Matthew*, 942 F.2d 779, 783 (10th Cir. 1991) (where warrant failed to describe firearms, seizure of weapons was not constitutionally impermissible given their close proximity to the illegal drugs); *United States v. Wayne*, 903 F.2d 1188, 1195-96 (8th Cir. 1990) (weapons in plain view were properly seized by the police during execution of warrant for narcotics).   Many of the tools and gardening implements, including the chainsaws and power washers, were correctly attributed to the cultivation of marijuana.[6]   Finally, while the warrant did not include language allowing for the seizure of money, the currency found by the police is adequately linked with trafficking so as to avoid any issues of particularity.   *Cf. United States v. Burns*, 624 F.2d 95, 101 (10th Cir. 1980) (seizure of unlisted cash did not abuse Fourth Amendment where warrant accounted for "implements used in connection with manufacture of drugs").

---

6 The Government's exhibits show that the marijuana plants sat atop wooden pallets and lattice work.   There are a number of precisely cut wooden boards resting on this system of pallets.   In addition, it is fairly probable that cleaning devices like pressure washers would be employed in such marijuana grow operations considering the number and size of the potted plants.   The Court believes that these facts underscore the connection between the chainsaws and pressure washers to the drug's cultivation.

"Although a search warrant is not invalid if it requires 'officers executing the warrant to exercise some minimal judgment as to whether a particular item falls within the described category,' at some point the description of the items to be seized becomes so general as to no longer be 'particular.'" *United States v. Popham*, 382 F. Supp. 2d 942, 955 (E.D. Mich. 2005) (quoting *United States v. Blair,* 214 F.3d 690, 697 (6th Cir. 2000)).   In *United States v. Popham*, the district court examined the scope of a search warrant where the document allowed the seizure of "equipment used to cultivate marijuana." *Id*. at 955.   While the court believed some of the tools fell within authorization to take cultivation equipment, other items had a more attenuated connection to the defendant's illegal activities. *Id*.   Here, Norris requests the suppression of the backhoe attachment, jewelry, and a 4x4 all-terrain vehicle.   The Government says that these items could be utilized in the cultivation of marijuana, but the Court is unconvinced.   Neither party disputes the entire growing operation was located *inside* the Barn.   The Court struggles to conceive a scenario where a backhoe or a 4x4 all-terrain vehicle could have been used within the Barn during the marijuana's cultivation or trafficking.   In addition, the Government has made no showing on the connection between the jewelry and the alleged criminal activities.   The Court concludes that these items were improperly seized under the warrant's authority.

Where the police incorrectly seize items that are not covered by a warrant, suppression of those items may be authorized. *United States v. Lambert*, 771 F.2d 83, 93 (6th Cir. 1985).   Still, the entire warrant is usually upheld and the items that were lawfully seized are not suppressed unless there was "flagrant disregard" for the limitations of the warrant. *Id*. (citations omitted). "Thus, where the officers unlawfully seize certain items but do not flagrantly disregard the limits of the warrant by unreasonably searching places not authorized in the warrant, the court must suppress the unlawfully seized items, but 'there is certainly no requirement that lawfully seized

16

evidence be suppressed as well.'" *United States v. Garcia,* 496 F.3d 495, 507 (6th Cir. 2007) (quoting *Waller v. Georgia,* 467 U.S. 39, 43 n. 3 (1984)).

White, Hodges, and the other law enforcement officers made a good faith effort to stay within the bounds of the warrant. They searched the areas described within its four corners and almost all of the evidence seized bears on the trafficking and cultivation of marijuana. The Court will not suppress the lawfully seized evidence taken from the Property. *Cf. United States v. Carpenter*, 317 F.3d 618, 624 (6th Cir. 2003) (improper seizure of a few items did not require suppression of all evidence taken by police) judgment vacated on different grounds 360 F.3d 591 (6th Cir. 2004); *United States v. Dirr*, No. 3:08-CR-42, 2009 WL 5892996, at *47-48 (E.D. Tenn. Aug. 28, 2009) (six items improperly seized did not amount to "flagrant disregard"). Norris may move for the return of the backhoe attachment, 4x4 all-terrain vehicle, and jewelry, along with any other property he believes was improperly taken and in which the Government does not have a "continuing interest." *See Popham*, 382 F. Supp. 2d at 955-56 (describing the process to recover items taken by the police).

## CONCLUSION

For these reasons, it hereby ORDERED that:

(1) Defendant's motion to suppress (DN 21) is DENIED.

(2) Defendant's other motions (DN 30; DN 31; DN 34) are GRANTED IN PART AND DENIED IN PART. The Court has considered the new evidence supplied by the Defendant, including the affidavits and exhibits. However, reopening the suppression hearing for more testimony is unnecessary.

(3) Defendant's motion for an order of discovery (DN 17) is DENIED with leave to refile. The parties have exchanged a great deal of discovery during the resolution of this

suppression issue and the Court concludes the requests in the motion may have been

resolved.   If Defendant believes otherwise, he is free to refile the motion and the Court

will consider the matter upon the Government's response.